## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| **TOUCHSTREAM TECHNOLOGIES, INC.,** | |
| *Plaintiff,* | Case No. _____ |
| v. | |
| **YAMAHA CORPORATION,** | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Touchstream Technologies, Inc., hereby files this Complaint for Patent Infringement against Yamaha Corporation and alleges, upon information and belief, as follows:

## THE PARTIES

1.      Plaintiff Touchstream Technologies, Inc., d/b/a Shodogg ("Touchstream" or "Plaintiff") is a Delaware corporation with its principal place of business in South Dakota.

2.      On information and belief, Defendant Yamaha Corporation ("Yamaha") is a Japanese corporation with a principal place of business at 10-1 Nakazawa-cho, Chuo-ku, Hamamatsu, Shizuoka 430-8650 Japan.

## NATURE OF THE ACTION

3.      This is a civil action against Yamaha for patent infringement arising under the patent statutes of the United States, 35 U.S.C. § 271 *et seq.* for the infringement of United States Patent Nos. 11,468,118 (the "'118 Patent"), No. 9,767,195 (the "'195 Patent"), and No. 11,475,062 (the "'062 Patent") (collectively, "the Touchstream Patents"). A true and correct copy of the '118

Patent, the '195 Patent, and the '062 Patent are attached as **Exhibits 1, 2, and 3**, respectively, to this Complaint.

## JURISDICTION AND VENUE

4.     This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over Yamaha in this action because Yamaha has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Yamaha would not offend traditional notions of fair play and substantial justice.  Yamaha has engaged in continuous, systematic, and substantial activities within this State, including substantial marketing and sales of products—including the MusicCast products that are used by Yamaha in connection with performing the accused MusicCast functionalities—within this State.  Furthermore, Yamaha—directly and/or through agents, subsidiaries, and/or intermediaries—has committed and continues to commit acts of infringement in this District by, among other things, importing, performing, and using the MusicCast services.  Yamaha also has derived substantial revenues from infringing acts in this District, including from the performance and use of the infringing MusicCast products and functionalities in this District, as well as the import, sale, and offer for sale of MusicCast compatible products, including through authorized dealers located in this District.

6.     Yamaha has not disputed this Court's personal jurisdiction over it in other patent-infringement actions.  *See, e.g.*, *SoundStreak Texas, LLC v. Yamaha Corp., et al*., No. 21-cv-321-JRG-RSP, ECF No. 14 (E.D. Tex. Dec. 7, 2021).

7.     Venue is proper as to Yamaha because, *inter alia*, pursuant to 28 U.S.C. §§ 1391(b)-(c) and/or § 1400(b), Yamaha is not resident in the United States and thus may be sued in any judicial

district, including this one. In particular, Yamaha is a corporation organized and existing under the laws of Japan. Venue is proper as to Yamaha pursuant to 28 U.S.C. § 1391(c)(3) because venue is proper in any judicial district against a foreign corporation.

8.      Venue is also proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b).  Yamaha maintains a permanent physical presence within the Eastern District of Texas (itself and/or through its agents), conducting business from numerous locations, including but not limited to a music school in Plano, Texas, in Collin County.  Further, Yamaha lists on its website retail stores in Plano, Allen, McKinney, Longview, Frisco, Lufkin, Beaumont, and Port Arthur as authorized dealers for MusicCast products.  Yamaha also has committed acts of infringement in this District, as described above.

9.      Yamaha directly and/or indirectly tests, distributes, markets, imports, offers to sell, sells, and/or utilizes the MusicCast products that perform the accused MusicCast functionalities in the Eastern District of Texas, and otherwise purposefully directs infringing activities to this District in connection with its MusicCast products.

10.     As explained below, this Court is familiar with Touchstream's technology and patents due to ongoing litigation in this District between Touchstream and various cable companies.

11.     Yamaha has not contested that venue properly lies in this District in other patent-infringement actions against it.  *See, e.g.*, *SoundStreak Texas, LLC v. Yamaha Corp., et al*., No. 21-cv-321-JRG-RSP, ECF No. 14 (E.D. Tex. Dec. 7, 2021).

## TOUCHSTREAM'S PATENTS

12.     In 2010, David Strober, the inventor of the Touchstream Patents and the original founder of Touchstream, was working at Westchester Community College as a Program Manager and e-learning instructional designer.  At this job Mr. Strober facilitated the development of online college courses, developing software as needed to support those efforts.

COMPLAINT FOR PATENT INFRINGEMENT                                                          Page 3

13.     At least as early as mid-2010, Mr. Strober perceived the need to be able to take content that could be viewed on a smaller device, like a smartphone, and "move" it to another device, like a computer monitor or television.  In working to bring his idea to fruition, Mr. Strober expanded his work by using a device like a smartphone to cause content to play on a second screen, even if that content resided elsewhere (like the public internet).  Near the end of 2010, Mr. Strober had developed a working prototype that demonstrated his groundbreaking concept.  Recognizing that that his invention could revolutionize how people located, viewed, and shared media, Mr. Strober filed his first patent application in April 2011.

14.     The Touchstream Patents are not directed to an abstract idea, but are limited to a specific, concrete messaging architecture. The claims require various components to send or receive signals (or messages) to control the playback of content from various media players over a network, with precise requirements varying by claim. They do not cover all forms of remote control of content over a network. Steps of the '118 Patent claims include, *inter alia*:

- Receiving a unique identifier of a content presentation system by a personal computing device;

- Generating a set of messages including a command in a first format, a reference to a piece of content associated with a particular media playing application, an identifier that corresponds to the particular media playing application, and the unique identifier of the content presentation system;

- Communicating the generated set of messages to a server system that sends a second command in a second format converted from the set of messages based on the command and a configuration of the particular media playing application to a content presentation system based on its unique identifier;

COMPLAINT FOR PATENT INFRINGEMENT                                                    Page 4

- Causing the content presentation system to utilize the second command and the particular media playing application to control the referenced piece of content.

15. The '062 Patent recites similar steps, with some additional steps.

16. The '195 Patent recites steps performed by elements including, *e.g.*, a display host and a switchboard server system.  Steps of the '195 Patent include, *inter alia*:

- Executing a plurality of instances of a browser configured to retrieve and load any of a plurality of different media players to play specified content at a display host;

- Associating an instance of the browser with a handheld personal computing device and a display device at a switchboard server system;

- Receiving messages from the personal computing device at the switchboard server system including a unique identifier associated with the browser instance and the display device and a universal command instructing that content be played in the browser instance using a media player;

- Converting the universal command into a portion of code specific to the media player to control playing of the content on the media player;

- Transmitting from the switchboard server system the portion of code and the unique identifier to the display host;

- Retrieving and loading the media player using the browser instance by the display host;

- Executing the portion of code to play the content in the browser instance using the media player at the display host;

- Causing presentation of the content to be mirrored onto a virtual client residing on the display device.

17.     Further, Mr. Strober's improvements in this area do not reflect routine or conventional steps. The arrangement of components and steps themselves is inventive, enabling, among other things, using different media players, associating different devices with a unique identifier, and coordinating between a personal computing device and content presentation system utilizing a plurality of media players, pieces of content, and control commands.

18.     The Touchstream Patents, which are entitled "Play Control of Content on a Display Device" and "Virtualized Hosting and Displaying of Content Using a Swappable Media Player," each claim priority to U.S. Provisional Patent Application No. 61/477,998 (filed on April 21, 2011).

19.     Touchstream is the owner, by assignment, of all rights, title, and interest in the '118 Patent, the '195 Patent, and the '062 Patent.

## **TOUCHSTREAM REVOLUTIONIZES CONTENT STREAMING**

20.     In 2011, inventor David Strober officially incorporated Touchstream to share his inventions with the world.

21.     In the following years, Touchstream raised millions of dollars in investments.

22.     Since 2011, Touchstream, d/b/a "Shodogg," developed software that enables content to be wirelessly cast (*e.g.*, accessed, displayed, and controlled) from a mobile device to a second device (*e.g.*, TV, computer, tablet, etc.).  Touchstream has been a leader in developing casting technology and has received numerous awards and recognition.

23.     Unfortunately, the efforts of Touchstream and Touchstream's partners to appropriately monetize Mr. David Strober's inventions were significantly hindered by infringement of the Touchstream Patent, including by Yamaha.  The timing and scope of Yamaha infringement is discussed in more detail below.

## THE ACCUSED MUSICCAST FUNCTIONALITIES

24.     Yamaha unveiled its line of MusicCast products and MusicCast Controller application—which perform the infringing MusicCast functionalities—in or around 2015.[1]

25.     According to Yamaha's website, "MusicCast is a streaming and multi-room audio system built into many Yamaha products, including AV receivers, sound bars, wireless speakers and a turntable. Designed to work with your Wi-Fi® router, MusicCast lets you stream all of your music and other audio content to every room in your home with easy control from the MusicCast app, an Alexa device or third-party control system, such as Control4, Crestron, ELAN, RTI, or URC."[2]

26.     The accused MusicCast functionalities comprise the methods performed through operation of at least the MusicCast Controller application,[3] and associated MusicCast compatible devices.[4] The MusicCast products did provide in the past, and continue to provide, functionality that facilitates the controlling of content, such as audio content, on a content presentation system described in further detail below.

---

[1] Yamaha, *Yamaha Corporation Annual Report 2017*, 111 (2017),
https://www.yamaha.com/en/ir/library/publications/pdf/an-2017e.pdf.
[2] Yamaha, *About MusicCast,*
https://usa.yamaha.com/products/contents/audio_visual/musiccast/musiccast-faqs.html (last visited Sept. 9, 2024).
[3] Yamaha, *MusicCast Controller*,
https://usa.yamaha.com/products/audio_visual/apps/musiccast_controller/index.html (last visited Sept. 9, 2024).
[4] Yamaha, *MusicCast Compatibility,* (Oct. 2021),
https://usa.yamaha.com/products/contents/audio_visual/musiccast/musiccast-compatiblity.html.






Yamaha MusicCast Controller Application.[5]



Yamaha MusicCast Promotional Material. Yamaha.[6]

27.     MusicCast compatible devices support wireless communication protocols including Wi-Fi

and Bluetooth as well as wired communication interfaces such as HDMI, optical, digital coax,

---

[5] Yamaha Corporation of America, *MusicCast Controller - US,* Apple App Store,
https://apps.apple.com/us/app/musiccast-controller-us/id1002730190 (last vised Sept. 9, 2024).
[6] *Audio & Visual: MusicCast,*
https://usa.yamaha.com/products/contents/audio_visual/musiccast/index.html (last visted Sept. 9, 2024).

analog, and phono.[7]  MusicCast provides playback of content including from Internet-based streaming music services on individual devices as well as multi-room configurations.  An example of this is shown below.





Exemplary MusicCast Devices Supporting Streaming Music and Multi-Room Audio.[8]

[7] Yamaha, *MusicCast Controller*,
https://usa.yamaha.com/products/audio_visual/apps/musiccast_controller/index.html (last visited Sept. 9, 2024).
[8] Yamaha, *MusicCast Wireless Multi-Room Audio,*
https://usa.yamaha.com/products/audio_visual/musiccast/index.html (last visited Sept. 9, 2024).

## 9.1.  Link Function

Here explains how to use MusicCast Link function with YXC commands.
Assume that <u>MusicCast Network initial setup</u> is already done and MusicCast Network is established as following.



Exemplary Device Configuration for a MusicCast Network.[9]

28.    MusicCast compatible devices connected to a network via wireless or wired interfaces such as Wi-Fi or Ethernet are assigned a network identifier such as an IP address.  MusicCast compatible devices are additionally associated with device identifiers including a serial number, UDN, or UUID.[10] Upon initial operation, available MusicCast compatible devices are discovered on the network and configured with a Location Name, Room Name, and Room Image.  An example of this is shown below.

---

[9] *Yamaha Extended Control API Specification (Advanced)* Rev. 2.00 at pg. 15 (2018).
[10] *Yamaha Extended Control API Specification (Basic)* Rev. 1.00 at pg. 58 (2018).

## 8. MusicCast Network Initial Setup

Initial Setup means to let a MusicCast Device join to MusicCast Network. It can be done only though MusicCast CONTROLLER app. To do so, download and install the free app of MusicCast CONTROLLER to mobile devices (smart phones, tablets)

> AppStore
> (US)
> https://itunes.apple.com/us/app/musiccast-controller-us/id1002730190
> (Outside US)
> https://itunes.apple.com/jp/app/musiccast-controller/id1012248381
>
> GooglePlay
> https://play.google.com/store/apps/details?id=com.yamaha.av.musiccastcontroller

1. Launch the app
   Choose "Setup" when it's launched. When you setup 2nd or more MusicCast devices, choose "Add New Device" in the setup menu of the app.
2. Turn on the power of MusicCast Device being setup.
3. Press and hold "CONNECT" button on a MusicCast Device for more than 5 seconds
4. Choose or type in Location Name
5. Choose or type in Room Name
6. Choose a Room Image



*Yamaha Extended Control API Specification (Advanced)* Rev. 2.00 at pg. 14 (2018).

29.　MusicCast multi-room devices may be linked into groups identified with a GroupID, including client and master devices.[11]

30.　Using the MusicCast Controller application on a mobile device such as a smartphone or tablet, a user can select content for playback, connect to a MusicCast compatible device or group of devices, and control playback of the content via universal commands such as play, pause, stop, fast forward, or reverse. For instance, a user may select a particular song from a playlist of music.

---

[11] *Yamaha Extended Control API Specification (Advanced)* Rev. 2.00 at pg. 15-22 (2018).

MusicCast commands are communicated in messages generated at the smartphone or tablet—such as HTTP, GET, or POST messages—to a server system including at least the HTTP server component of a MusicCast compatible device in accordance with the Yamaha Extended Control API Specification ("YXC API").[12] On information and belief, the server system implements the control functions of the Extended Control API resulting in a conversion of at least the command format based on the included command and an identified streaming music playing application. The result of the communication of control messages to the server system causes a selected MusicCast compatible device to utilize the converted command and a particular media playing application to control playback of content referenced in the messages.

31.     On information and belief, Yamaha maintains session information associating devices participating in a MusicCast network including, *e.g.*, a mobile device, an instance of the MusicCast Controller application, the HTTP server component of a MusicCast compatible device, an HTTP request message including the IP address or device identifier of a MusicCast compatible device, a group identifier linking MusicCast compatible devices for multi-room playback of content, or an instance of a browser loading a media player.

32.     On further information and belief, playback of content from Internet-based streaming music services involves browser components executing on MusicCast compatible devices such that media players for specified content may be retrieved and loaded using an instance of a browser.

33.     On further information and belief, MusicCast multi-room configurations enable synchronized playback of content on different MusicCast compatible devices on a network.

---

[12] *Yamaha Extended Control API Specification (Basic)* Rev. 1.00 at pg. 33-34 (2018).

34.     Various MusicCast compatible devices include display capabilities such as LED/LCD panels or HDMI interfaces for presenting content via a connected display such as a TV.  An example of this is shown below.



Exemplary MusicCast Device with LCD Display Panel[13]



Exemplary Display Output from a MusicCast Device via HDMI to a TV.[14]

35.     Through the managing of the YXC API provided by the server component of MusicCast compatible devices, and through the processing of messaging sent by the MusicCast Controller

---

[13] CNET, *Yamaha's RX-V681 Offers Streaming and Home Cinema Thrills*, YouTube, at 0:05 (Feb. 7, 2017), https://www.youtube.com/watch?v=TA85T9mHB9o.
[14] CNET, *Yamaha's RX-V681 Offers Streaming and Home Cinema Thrills,* YouTube, at 1:08 (Feb. 7, 2017), https://www.youtube.com/watch?v=TA85T9mHB9o.

COMPLAINT FOR PATENT INFRINGEMENT                                         Page 13

application running on the mobile device—as described at ¶¶ 30–34, *supra*—the MusicCast system allows the user to consume media content on a remote device, separate from the user's mobile device, where the media content and/or media player may be downloaded from the network rather than from the mobile device itself.  The user is therefore free to use his or her mobile device for other purposes during playback of the media on the remote MusicCast compatible device.

36.     Each of the steps discussed above is either performed by or otherwise attributable to Yamaha.  To the extent another actor performs any of these steps, Yamaha directs or controls that performance, conditioning participation in the activity or the receipt of a benefit upon performance of the patented method steps, and establishing the manner or timing of that performance. Additionally, Yamaha profits from its infringement and has the right and ability to stop or limit the infringement.  For instance, Yamaha tests and demonstrates the accused functionality, including in advertisements.  Further, Yamaha advertises and demonstrates to customers, and directs to MusicCast and YXC API developers, that the infringing method steps will be performed, as shown above.  Further, Yamaha causes automatic updates to the MusicCast system.  As discussed below, the functionality advertised and directed by Yamaha infringes the Touchstream Patent, and on information or belief, is known by Yamaha to do so.

37.     On information and belief, Yamaha developed the MusicCast products and functionalities at its Japanese headquarters.  For example, Yamaha's website says that its research and development activities are performed at its Japanese headquarters.[15]  Yamaha does not maintain that any of its United States subsidiaries are tasked with the planning and development of audio equipment, such as the MusicCast products.[16]

---

[15] Yamaha, *Researchers,* https://www.yamaha.com/en/tech-design/research/student/ (last visited Sept. 10, 2024).
[16] Yamaha, *Group Companies (Worldwide)*, https://www.yamaha.com/en/about/locations/group-companies-worldwide/ (last visited Sept. 10, 2024).

38.     On information and belief, Yamaha directs and controls the actions of its agent-subsidiaries, including but not limited to those that develop, import, sell, distribute, and perform the infringing MusicCast products and functionalities.  For example, the Owner's Manuals for MusicCast products retrievable from the websites of Yamaha's United States and Canadian subsidiaries are identical and list the address of Yamaha's Japanese headquarters and link to the "Yamaha Global Site."[17] Further, Yamaha's website touts that Yamaha is a "global operation" and often refers to Yamaha as "Yamaha Group."[18] Yamaha also has the right and ability to supervise its agent-subsidiaries to the extent those subsidiaries develop, import, sell, distribute, or perform the infringing MusicCast products and functionalities.  Finally, Yamaha shares certain officers and directors with its subsidiaries, and lists its subsidiaries and the officers of its subsidiaries on its website.[19]

39.     On information and belief, Yamaha has a direct financial interest in the infringing activity of its wholly owned subsidiaries because it derives revenue from the sale of the infringing MusicCast products.  For example, Yamaha reports on the revenue from the sale of audio electronics in the United States.[20]

---

[17] Yamaha, *Wireless Streaming Speaker WX-021 Owner's Manual*, (May, 2018) https://ca.yamaha.com/files/download/other_assets/2/1179542/web_WX-021OMEN_WX-021_om_UCRABGLEFP_En_D0.pdf.
[18] Yamaha, *About Us*, https://www.yamaha.com/en/about/ (last visited Sept. 10, 2024); Yamaha, *Message from the President*, https://www.yamaha.com/en/vision/message/ (last visited Sept. 10, 2024).
[19] Yamaha, *Director and Officers*, https://www.yamaha.com/en/about/officers/ (last visited Sept. 10, 2024).
[20] Yamaha, *Analyst and Investor Briefing on First Quarter of FY2025.3* (July 31, 2024), https://www.yamaha.com/en/ir/library/presentations/pdf/2025/pres-240731e.pdf.

## YAMAHA'S KNOWLEDGE OF TOUCHSTREAM'S PATENTS

40.     Since at least December 14, 2011, Touchstream has made publicly clear that its revolutionary product offerings were "patent-pending."[21]

41.     In 2011 and 2012, Touchstream attended various trade shows at which it presented its technology to develop business opportunities.  At these trade shows, it was Touchstream's practice to inform those to whom it presented that its technology was patent pending.  On January 12, 2012, a representative of Yamaha Canada Music Ltd. visited Touchstream's booth at one such trade show—the Consumer Electronics Show in Las Vegas, Nevada—for the purpose of "business development."

42.     Just days after the first of Touchstream's patents issued on January 15, 2013, Touchstream issued a press release announcing this patent award.[22]

---

[21] *See e.g.*, Sean Ludwig, *Shodogg Will Let You Pause and Restart Video From Any Device (Exclusive)*, VentureBeat (Dec. 14, 2011), https://venturebeat.com/2011/12/14/shodogg-video-sharing-phones-tvs-exclusive/; Shodogg, *Shodogg Launches at CES and Transforms Streaming Video Delivery by Fueling Industry Expansion with Content Providers*, Cision PR Newswire (Jan. 10, 2012), https://www.prnewswire.com/news-releases/shodogg-launches-at-ces-and-transforms-streaming-video-delivery-by-fueling-industry-expansion-with-content-providers-137010098.html; *see also* https://web.archive.org/web/20111003131546/http://shodogg.com/ (archived snapshot of Shodogg website from October 3, 2011) ("Shodogg is a patent-pending technology that allows viewers to access online streaming content from any smartphone and display it to any larger connected screen, such as a laptop, tablet, or TV.").

[22] Shodogg, *Shodogg Announces the Release of ScreenDirect a Business-to-Business Solution Enabling Companies to Seamlessly Direct Digital Content Across Screens*, Cision PR Newswire (Jan. 17, 2013) https://www.prnewswire.com/news-releases/shodogg-announces-the-release-of-screendirect-a-business-to-business-solution-enabling-companies-to-seamlessly-direct-digital-content-across-screens-187284641.html; *See also, e.g.*, *Meet Shodogg Who Won this Year's Techweek NYC Launch Competition*, AlleyWatch (Dec. 2014), https://www.alleywatch.com/2014/12/meet-shodogg-who-won-this-years-techweek-nyc-launch-competition/.

43.     It was pattern and practice for Touchstream to inform potential business partners of its patents and patent applications, as well as the fact that its technology was protected by those patents and patent applications.

44.     Touchstream has also been involved in significant, widely public litigation regarding infringement of its patents:

- **Vizbee, Inc.**  In 2017, Touchstream sued Vizbee in the Southern District of New York, asserting patents that claim priority back to the same patent application at issue in this case and, like the patents asserted here, claim priority to Mr. Strober's original prototype work in October 2010. *Touchstream Technologies, Inc v. Vizbee, Inc*., 17-cv-06247-PGG-KNF (S.D.N.Y.).  Vizbee and Touchstream litigated for more than two years and resolved the dispute in early 2020.

- **Google, LLC**.  In 2021, Touchstream sued Google in the Western District of Texas, asserting patents that claim priority back to the same patent application at issue in this case and, like the patents asserted here, claim priority to Mr. Strober's original prototype work in October 2010. *Touchstream Technologies, Inc. v. Google LLC*, 6:21-cv-00569-ADA (W.D. Tex.).  The Court rejected at summary judgment Google's defense that Touchstream's patents are invalid, and Google's requests for inter partes review were denied by the Patent and Trademark Office.  At trial, the jury awarded Touchstream approximately $339 million in damages.

- **Cable Companies**.  In 2023, Touchstream sued the three largest cable company groups—Comcast, Charter, and Altice—in this Court. *Touchstream Technologies, Inc. v. Charter Communications, Inc. et al*., 2:23-cv-00059-JRG (E.D. Tex.).  Touchstream's claims against Comcast and Charter are set to be tried to a jury in October 2024.

COMPLAINT FOR PATENT INFRINGEMENT                                            Page 17

45.     These litigations—and particularly Touchstream's verdict against Google—received significant press coverage.[23] Yamaha was either aware of these litigations or willfully blind to them, and never approached Touchstream about a license during the pendency of any of these litigations.

46.     Prior to initiating this litigation, Touchstream communicated with individuals within the Yamaha corporate family abouts its technology to explore the possibility of doing business with Yamaha.   On information and belief, the employees and agents of Yamaha contacted by Touchstream freely share information with Yamaha.

47.     Touchstream also sent Yamaha a cease-and-desist letter, notifying Yamaha of Touchstream's contention that the MusicCast Functionalities infringe on the Touchstream Patents, attaching detailed claim charts, and asking Yamaha to cease infringing activities.

48.     Despite knowing of the Touchstream Patents, Yamaha intentionally decided to disregard Touchstream's intellectual property rights and willfully infringe the Touchstream Patents.

49.     At no point did Yamaha reach out to Touchstream about potentially acquiring a license to Touchstream's pending or awarded patents, and to this day Yamaha has not requested or received a license to any of the Touchstream Patents.

50.     Accordingly, on information and belief, Yamaha knew of Touchstream's patented technology and the Touchstream Patents, knew that its products were infringing, and continues to sell, offer for sale, and/or use the Accused Functionalities and Accused Products such that Yamaha is willfully infringing the Touchstream Patents.

---

[23] *See, e.g.,* Blake Brittain, *Google Owes $338.7 Million in Chromecast Patent Case, US Jury Says*, Reuters (July 24, 2023); Ryan Davis, *Google Told to Pay $339M In WDTX Chromecast Patent Trial*, Law360 (July 21, 2023).

51.     The facts discussed above support an inference of conscious copying by Yamaha of Touchstream's technology, which Yamaha knew or should have known was patented such that copying would amount to patent infringement.   The similarity of Yamaha's technology to that presented by Touchstream evidences copying with the knowledge that this would lead to infringement.

52.     Further, Yamaha has not ceased its infringing behavior. To date, Yamaha is still selling, offering for sale, and/or using the Accused Functionalities and Accused Products such that Yamaha is willfully infringing the Touchstream Patents.

53.     All of these facts taken together constitute willful infringement by Yamaha, with actual or imputed knowledge of Touchstream's patents, or at the very least willful blindness to the knowledge of those patents.

54.     To the extent Yamaha does not directly infringe the Touchstream Patents, it has induced infringement by its United States subsidiaries from at least the date of Touchstream's cease-and-desist letter to Yamaha, but more likely earlier due to the various correspondence between the companies about the Touchstream Patents and the similarity between Yamaha's accused technology and the inventions disclosed in the Touchstream Patents. Since at least the period previously discussed, Yamaha has induced its agents in the United States to perform the accused services in the way claimed in the Touchstream Patents for the unique benefits provided by those valuable inventions, as described above. *See also* ¶¶ 36-53, *supra*.

## <u>COUNT I: INFRINGEMENT OF THE '195 PATENT</u>

55.     Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1–54, *supra*.

56.     Yamaha directly infringes, either individually or jointly through acts of its controlled agent subsidiaries, at least claim 17 of the '195 Patent by performing the methods described in ¶¶ 24–36, *supra*.

57.     For example, Yamaha (alone or in combination with its controlled agent subsidiaries) performs the method of presenting content. *See, e.g.*, ¶¶ 34–35, *supra*. Yamaha further executes, at a display host, a plurality of instances of a browser, wherein each instance of the browser is configured to retrieve and load any of a plurality of different media players to play specified content. *See, e.g.*, ¶¶ 31–32 *supra*. Yamaha further associates, at a switchboard server system, a first instance of the browser with a first handheld Internet-enabled personal computing device and a first display device. *See, e.g.*, ¶¶ 30-34, *supra*. Yamaha further receives, at the switchboard server system from the first personal computing device, a first message comprising a unique identifier associated with the first instance of the browser and the first display device, and a universal command instructing that first content be played in the first instance of the browser using a first media player. *See, e.g.*, ¶¶ 28-34, *supra*. Yamaha further converts, using the switchboard server system, the universal command to a first portion of code specific to the first media player to control playing of the first content on the first media player. *See, e.g.*, ¶¶ 30-34, *supra*. Yamaha further transmits, from the switchboard server system, the first portion of code and the unique identifier to the display host. *See, e.g.*, ¶¶ 30-34, *supra*. Yamaha further retrieves and loads, by the display host, the first media player using the first instance of the browser. *See, e.g.*, ¶¶ 32-34, *supra*. Yamaha further executes, at the display host, the first portion of code to play the first content in the first instance of the browser using the first media player. *See, e.g.*, ¶¶ 32-34, *supra*. Yamaha further causes, by the display host, a presentation of the first content to be mirrored onto a virtual client residing on the first display device. *See, e.g.*, ¶¶ 34-35, *supra*.

58.     Alternatively, or in addition to its direct infringement, Yamaha actively encourages its subsidiaries, vendors, and/or customers to infringe through the manner described above. Despite knowing of the Touchstream Patents, Yamaha has and continues to actively induce its subsidiaries, vendors, and/or customers to perform the steps of at least claim 17 of the '195 Patent. Yamaha encourages this infringement with a specific intent to cause its subsidiaries, vendors, and/or customers to infringe. Yamaha's acts thus constitute active inducement of patent infringement in violation of 35 U.S.C. § 271(b). *See, e.g.*, ¶¶ 36-53, *supra*.

59.     Yamaha's infringement of the '195 Patent has been, is, and continues to be willful, including Yamaha's infringement of at least claim 17 as described at ¶¶ 40-53, *supra*.

60.     Touchstream has been and will continue to be irreparably harmed by Yamaha's infringing acts, requiring the entry of a permanent injunction to prevent Yamaha's further infringement of the '195 Patent because Touchstream does not have another adequate remedy at law.

## COUNT II: INFRINGEMENT OF THE '118 PATENT

61.     Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1–60, *supra*.

62.     Yamaha directly infringes, either individually or jointly through acts of its controlled agent subsidiaries, at least claim 8 of the '118 Patent by performing the methods described in ¶¶ 24-36, *supra*.

63.     For example, Yamaha (alone or in combination with its controlled agent subsidiaries) performs the computer-implemented method for remotely presenting various types of content. *See, e.g.*, ¶¶ 24-36, *supra*. Yamaha further receives, by a personal computing device, a unique identifier of a content presentation system. *See, e.g.*, ¶¶ 28-31 *supra*. Yamaha further generates, by the personal computing device, a set of messages that includes a first command in a first format, a reference to a piece of content associated with a particular media playing application, an identifier

that corresponds to the particular media playing application, and the unique identifier.  *See, e.g.*, ¶¶ 30-31, *supra*.  Yamaha further communicates, by the personal computing device, the generated set of messages to a server system configured to send, to the content presentation system based on the unique identifier, a second command in a second format, the second command being converted from the set of messages based on each of the first command and a configuration of the particular media playing application, wherein the second format is associated with the particular media playing application and the second command corresponds to the first command.  *See, e.g.*, ¶¶ 30-31, *supra*.  Yamaha further causes, by the personal computing device, the content presentation system to utilize the second command and the particular media playing application to control the referenced piece of content.  *See, e.g.*, ¶¶ 32-35, *supra*.

64.     Alternatively, or in addition to its direct infringement, Yamaha actively encourages its subsidiaries, vendors, and/or customers to infringe through the manner described above. Despite knowing of the Touchstream Patents, Yamaha has and continues to actively induce its subsidiaries, vendors, and/or customers to perform the steps of at least claim 8 of the '118 Patent. Yamaha encourages this infringement with a specific intent to cause its subsidiaries, vendors, and/or customers to infringe. Yamaha's acts thus constitute active inducement of patent infringement in violation of 35 U.S.C. § 271(b). *See, e.g.*, ¶¶ 36-53, *supra*.

65.     Yamaha's infringement of the '118 Patent has been, is, and continues to be willful, including Yamaha's infringement of at least claim 8 as described at ¶¶ 40-53, *supra*.

66.     Touchstream has been and will continue to be irreparably harmed by Yamaha's infringing acts, requiring the entry of a permanent injunction to prevent Yamaha's further infringement of the '118 Patent because Touchstream does not have another adequate remedy at law.

## COUNT III: INFRINGEMENT OF THE '062 PATENT

67.     Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1–66, *supra*.

68.     Yamaha directly infringes, either individually or jointly through acts of its controlled agent subsidiaries, at least claim 10 of the '062 Patent by performing the methods described in ¶¶ 24-36, *supra*.

69.     For example, Yamaha (alone or in combination with its controlled agent subsidiaries) performs the computer-implemented method for remotely presenting various types of content. *Id.* Yamaha further generates, by a personal computing device, a set of messages that includes a first command in a first format and a reference to a piece of content associated with a particular media playing application. *See, e.g.*, ¶ 30. Yamaha further communicates, by the personal computing device, the generated set of messages to a server system, wherein the server system is configured to generate a second command in a second format based on each of the first command and a configuration of the particular media playing application associated with the referenced piece of content. *See, e.g.*, ¶¶ 30-34. Yamaha further causes, by the personal computing device based on the communication, a content presentation system communicatively coupled to the server system to utilize the second command to control the presentation of the referenced piece of content via the particular media playing application. *See, e.g.*, ¶¶ 32-35.

70.     Alternatively, or in addition to its direct infringement, Yamaha actively encourages its subsidiaries, vendors, and/or customers to infringe through the manner described above. Despite knowing of the Touchstream Patents, Yamaha has and continues to actively induce its subsidiaries, vendors, and/or customers to perform the steps of at least claim 10 of the '062 Patent. Yamaha encourages this infringement with a specific intent to cause its subsidiaries, vendors, and/or

customers to infringe. Yamaha's acts thus constitute active inducement of patent infringement in violation of 35 U.S.C. § 271(b). *See, e.g.*, ¶¶ 36-53, *supra*.

71.     Yamaha's infringement of the '062 Patent has been, is, and continues to be willful, including Yamaha's infringement of at least claim 10 as described at ¶¶ 40-53, *supra*.

72.     Touchstream has been and will continue to be irreparably harmed by Yamaha's infringing acts, requiring the entry of a permanent injunction to prevent Yamaha's further infringement of the '062 Patent because Touchstream does not have another adequate remedy at law.

## JURY DEMAND

73.     Touchstream demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Touchstream requests entry of a judgment in its favor and against Yamaha as follows:

  a)     Judgment that Yamaha has directly infringed one or more claims of the Touchstream Patents;

  b)     Judgment that Yamaha has induced infringement of one or more claims of the Touchstream Patents;

  c)     An award of damages to compensate for Yamaha's infringement, including damages pursuant to 35 U.S.C. § 284, as well as prejudgment and post-judgment interest;

  d)     An award of costs and expenses in this action, including an award of Touchstream's reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

  e)     A permanent injunction restraining and enjoining Yamaha, and its respective officers, agents, servants, employees, attorneys, and those persons or entities in active concert or participation with Yamaha who receive actual notice of the order

by personal service or otherwise, from any further sales or use of their infringing products and/or services and any other infringement of the Touchstream Patents;

f)    A finding that Yamaha has willfully infringed and is willfully infringing one or more claims of the Touchstream Patents;

g)    A finding that this case is an exceptional case, and awarding treble damages due to Yamaha's deliberate and willful conduct, and ordering Yamaha to pay Touchstream's costs of suit and attorneys' fees; and

h)    For such other and further relief as the Court may deem just, proper, and equitable under the circumstances.

Dated: September 10, 2024                  Respectfully Submitted,

*/s/ Anita Liu*
Ryan D. Dykal (*pro hac vice* forthcoming)
Jordan T. Bergsten (*pro hac vice* forthcoming)
Mark Schafer (*pro hac vice* forthcoming)
Anita Liu (TX State Bar No. 24134054)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave, NW
Washington, DC 20005
(t) 202-274-1109
rdykal@bsfllp.com
jbergsten@bsfllp.com
mschafer@bsfllp.com
aliu@bsfllp.com

Sabina Mariella (*pro hac vice* forthcoming)
**BOIES SCHILLER FLEXNER LLP**
55 Hudson Yards, 20th Floor
New York, NY 10001
smariella@bsfllp.com

***Counsel for Plaintiff***
***Touchstream Technologies, Inc.***